Hospital, L.L.C. v. LA Health Svc & Indemnit Areas for health benefits. Those are causes of action 1 and 5. And if you look at Judge Rivelie's decision in AccessMedEquip, he draws a very clear distinction between misrepresentation claims on the one hand which do not depend on coverage at all. You don't even need to allege that there was underlying coverage, the insurance company said there was and that you the provider would be paid. That's enough. That's all you need to show. On the other hand, claims like unjust enrichment are preempted and those do relate to benefits necessarily because the theory of an unjust enrichment claim is I as the insurance company was unjustly enriched because I didn't have to pay some other provider for providing benefits under the insurance policy. And that is extremely clear from Judge Rivelie's AccessMedEquip decision. So the only question regarding the complete preemption issue has nothing to do with the law and has only to do with the construction of Omega's petition in the state court. And that's what I would like to go through a little bit because I think it makes clear that while there absolutely are claims for misrepresentation, there are other claims as well. And as this court noted in the Giles case, one claim that's completely preempted is enough to be able to remove the entire case. And so I urge the court to look carefully at Omega's petition in the state court because it covers a lot of ground. As I said, it does make misrepresentation claims, but it also makes claims that sound like they're antitrust claims, that it colluded, it literally uses the word collusion with other Blue Cross entities, that it used its market power unfairly. Again, sort of antitrust sounding claims. These are in paragraphs 29 and 30 of the petition, which starts at record page 125. There are also allegations that Blue Cross was purposely trying to drive providers out of business or threatening to retaliate against providers. And importantly, there are allegations that Blue Cross refused to preauthorize services. In other words, Omega called and said, will you tell me if this is, you're going to provide coverage? And Blue Cross said nothing. And that's an allegation. Well, of course, how can there be a recovery in a situation like that? It's certainly not based on misrepresentation because the whole allegation is that Blue Cross refused to make any representation. The only possible theories are that Omega is proceeding on a claim for benefits. And I think this becomes quite clear if you actually look at the causes of action in the petition. If you look at the three causes of action that we completely concede are based on misrepresentations, causes of action two, three, and four, they are riddled with references to misrepresentation. Just for example, cause of action number two, which is a cause of action for fraud, starts on record page 132. And in paragraph 48, defendants have made representations to Omega Hospital. Paragraph 50, defendants misrepresented such provisions to Omega Hospital. Paragraph 51, defendants' misrepresentations were material and Omega reasonably relied to its detriment on such misrepresentations. That's in paragraph 51. Paragraph 52, these defendants intended to deceive Omega Hospital with their misrepresentations. Paragraph 53, Omega was reasonably and justifiably entitled to rely on defendants' misrepresentations. Almost every paragraph in cause of action two talks about misrepresentation. The same thing is true of cause of action three and cause of action four. Well take a look at cause of action one and cause of action five. The word misrepresentation does not appear at all, nor does the concept of a misrepresentation. Instead, these causes of action allege that defendants have retained and continue to retain monies that rightfully belong to Omega Hospital for rendering covered medically necessary services to defendants' insurers. As Judge Rieveley pointed out in Access Medequip, it is a misrepresentation. These claims must be talking about something else. And Blue Cross reasonably interpreted that as meaning something other than a misrepresentation claim. Now Omega really has no response to this other than to say, well we had some other general language in there that tied it back to the rest of the complaint. And they do. But it doesn't tie back to misrepresentation. It ties it back only to some generalized unfair or unlawful conduct. Well as we just talked about, there are all kinds of unlawful conduct that are alleged that don't have anything to do with misrepresentation. So under that notion that what we really have is an unjust enrichment claim, the second prong of Davila is satisfied. The only other thing we would need to show is that the first prong is satisfied. In other words, that Omega could have brought a claim at some point in time. And they certainly could have because they had assignments of benefits. That's not disputed. There's actually an actual assignment of benefits in the record at page 362. Their only argument is, well we didn't allege that. Well you don't have to allege that. Many cases make that clear. This court made it clear in Lone Star. We cited a case called Emerus where the, from the court of Illinois earlier this year, where the plaintiff provider actually tried to literally throw away the assignments. They said, they signed a writing saying we forever waive our right to assignment before the lawsuit. And then they filed the lawsuit and the court said you can't do that. Under prong one of Davila, the question is could you at any point in time have brought a case? And they certainly could have. And Omega's only response to that is well, that was after the removal in this case. But come on, that is the state of the law. They weren't breaking new ground. And that Emerus case relies on this court's decision in Lone Star, a case called Franciscan Skempt from the Seventh Circuit, which Omega cites in their brief as being consistent with Fifth Circuit law. And on a case from the Southern District of Texas in 2010 called Spring versus Aetna. And actually the long quote in our spring. And in spring there was an issue about, there was a heavy dispute about whether or not there were assignments. It just doesn't matter. The fact that assignments exist is enough. The plaintiff doesn't have to be proceeding under them. Unless the court has any questions about the complete preemption issue, I'll turn to the federal officer removal issue. This issue, unlike the issue of complete preemption, is almost exclusively an issue of law. We have a disagreement about what the state of the law is, and in particular on the second and main factor under the federal officer removal test. And that is whether or not Blue Cross was acting under the Office of Personnel Management. And the dispute is that Omega says, well, you Blue Cross had to be under the direct and detailed control of the Office of Personnel Management. And I will admit that there are a number of district court cases within the Fifth Circuit that say that. But that is not the law and that has never been the law. Omega says that these courts sort of get this from this court's decision in Empire, I'm sorry, in Winters. But Winters simply doesn't say that. It happened to be in Winters that there was direct and detailed control by the federal agency there, but nothing in Winters suggests that that is an absolute requirement. And the Supreme Court in Watson makes very clear that that is not a requirement, as have every other circuit court of appeals to decide this decision, including the Isaacson case from the Second Circuit that we cite, the Bennett case from the Sixth Circuit, and perhaps most importantly for present purposes, the Jax decision from the Eighth Circuit, which involves another Blue Cross entity administering this very same program. And the court in Jax goes through a lot of the detail of the program, including the supervision that OPM has, the fact that Blue Cross entities literally are a federal treasury account, a very rare circumstance, and found that the federal officer removal test was met. And there is, other than a sprinkling or maybe perhaps more than a sprinkling of district court cases, there's nothing on the other side of that. There are no court of appeals decisions in any circuit that suggest that this detailed control test is applicable. And in fact, even within the Fifth Circuit, there are several district courts that reject the exact test that is being advanced by Omega here. Those are the tactics versus American Eurocopter case that we cited and the Grand Acadian case that we cited, just as examples. So at the very least, there was an objectively reasonable basis for Blue Cross to say that the federal officer removal statute applied and that it was acting under the Office of Personnel Management. Tell me what that requires to satisfy this statute. There are three basic elements. The first is that the removing party was a person, and no offense to the counsel who argued before me, but every court, including this court, has said that a person can be a corporation, so that part of the test is clearly met. The second part of the test is the removing party has to have been acting under a federal officer, and there has to be, as part of that, there has to be a causal nexus between actions acting under and the issues in the lawsuit.  I'm sorry? Well, the Supreme Court and Watson analyzed this thoroughly, and there are really two elements to that. Number one, it has to be a subservient relationship, so you can't be equal parties. If it's a purely commercial transaction, for example, that doesn't count. The government has to be in a superior relationship over the removing party, and I think that is clearly met here. OPM is Blue Cross's boss, that's for sure, in this relationship, and anything that OPM would tell the carrier to do, they have to do for a whole host of reasons, and there are many regulations that describe OPM's powers over Blue Cross, and the court in Jax lays those out. And second of all, there has to be an assistance element of the relationship. The removing party has to be helping the government, and here, it's clearly helping the government. It's helping it provide insurance to federal employees. The Jax case, again, analyzes this and explains that that's all that's going on. The only reason Blue Cross is doing this is to help the federal government provide insurance to employees. And the third element of the federal officer removal statute is there has to be a colorable, not an established, but just a colorable federal defense, and here, we allege that three defenses, sovereign immunity is the first, and preemption is the second, yes, Judge Riedley, and the third is displacement by federal common law under the Supreme Court's decision in Boyle. In Jax, the court found that all three of those were colorable for purposes of the federal officer removal statute, so in some sense, you need only look at Jax and find that Blue Cross, at the very least, had an objectively reasonable basis for removing this case. One other thing I wanted to mention, we mentioned in a footnote in one of our briefs that the 2011 amendment to the removal statute, and it's a relatively minor point because I think the court in Watson made very clear that there's no direct and detailed control required, as have the other circuit courts, but in 2011, Congress changed the statute to say, to apply only for any act under color of such office, to for or relating to any act under color of such office, and obviously, that language broadens the type of acts that can be covered under the federal officer removal statute. All right, thank you, Mr. Feinberg. You've saved time for rebuttal. Yes. Mr. Flanagan. May it please the court, Thomas Flanagan, on behalf of Omega Hospital, and the Board of Omega Hospital, LLC, the district court did not abuse its considerable discretion in awarding fees and costs to Omega as a result of Blue Cross' improper removal of this state law dispute. This morning, I'd like to discuss three points. First, under the Davila test and Fifth Circuit precedent, ERISA did not completely preempt health care providers' state law claims against insurers for not paying them amounts as promised. Second, Blue Cross' reliance upon FEBA as a basis for complete preemption was equally unreasonable. The United States Supreme Court held in 2006 that the FEBA statute did not permit a complete preemption argument because FEBA did not contain a jurisdiction conferring provision as to insurance companies. And third, in the face of Winters v. Diamond-Shamrock, Blue Cross could not reasonably invoke jurisdiction under the federal officer removal statute. Watson v. Philip Morris did not overrule Winters. Far from it. Let me begin with ERISA preemption. Again, the district court did not abuse its discretion in finding Blue Cross' arguments to be unreasonable. It's important to distinguish here, I think, between complete preemption and conflict preemption. The court's familiar with these. The difference between Section 502 and Section 514. The Access MediQuip case, for example, is a conflict preemption case. There is a much weaker standard. Davila, for complete preemption, provides a tougher standard. And there's a two-part test. Could the plaintiff have brought its claims under Section 502, a right reserved to planned participants and beneficiaries? And if so, does the plaintiff's suit implicate any legal theories independent of ERISA? Well, Blue Cross could not meet either part of the test, as the district court reasonably found. First, Omega is neither a participant nor a beneficiary. And as this court said in Memorial Hospital, providers don't have standing under Section 502. Counsel says that there's an obligation to meet the standards of the district court. In their notice of removal, they didn't mention any assignments. In their briefing to the district court, they did not mention any assignments. In their briefing to this court, they did not mention any assignments. But there's no question that no assignment was ever invoked by Omega in this case. And so that brings us back to Fifth Circuit authority. In Memorial Hospital versus Northbrook Life, this court, in a conflict preemption setting, again applying that weaker standard, said that an assignment would be, quote, irrelevant in the context of a state law claim by a provider who was not using that assignment. So since it's unquestionably the case that Omega has not invoked any assignment of benefits, any assignment in the record argued today for the first time would be irrelevant. And second, Omega's claims clearly implicate duties independent of ERISA, as the district court reasonably found. And here again, we find guidance in Memorial Hospital, which talked about the commercial reality. What goes on between hospitals and insurance companies, as they said, each day in America? And that is that providers contact insurance companies. And they want to verify in advance coverage and payment before they take the risk of treating a person who needs care. Otherwise, they'll have to make other financial arrangements. Omega's petition is replete, almost annoyingly so, with a repetition of this verification process. And I disagree with counsel on what the petition says, because it's quite clear, in paragraphs 15, 16, 23, 24, I could go on. It alleges misrepresentation by telephone actually calling Blue Cross in 06 and 07. And then after 07, and there's a letter, it's an attachment, Exhibit A to the petition, Blue Cross said, Omega, from now on, don't call us. Use our iLink Blue system. And the petition alleges that thereafter, that Omega did use the iLink Blue system, and that it contained verifications and representations upon which Omega relied. Now, there was a reference to the Access MediQuip case, with which Judge Reveley is very familiar. It was two points about that. First, that was Section 514, conflict preemption, not the de Villa test. But second, that was a very unique unjust enrichment allegation in that case. What the plaintiff alleged is that they provided care, wasn't compensated, and that even had they not done it, if someone else had provided the same care under the terms of the plan, the insurance company would have been liable. And the court recognized that was a unique allegation that directly invoked the terms of the plan, and for that purpose, it was conflict preempted, but not  Now, let's talk about our claims in 1 through 5, as is the style, at least, for the last 25 years, in my experience. Every claim incorporated by reference, all preceding allegations of the petition. Let me move on now to the question of FEBA. The District Court did not abuse its discretion here either. I think the starting point is Empire Health Choice, DBA, Blue Cross and Blue Shield versus McVeigh. That's a 2006 United States Supreme Court case. There, the Supreme Court, it was Justice Ginsburg, found that FEBA's statute was unusual. It didn't provide that federal law preempted state law. It provided that the terms of federal insurance contracts preempted any inconsistent state law. And she recognized, for the majority, that that unusual provision deserved a modest reading. And under that modest reading, complete preemption was not possible. And so the argument that there could be a reasonable belief in light of the McVeigh case, I think, is unsound. And again, the District Court did not abuse its discretion, and I keep coming back to that, because that is the standard of review. Cases have recognized that the authority upon which Blue Cross relies, a case called Botsford out of the Ninth Circuit, a case called Alabama Dental Association from the Middle District of Alabama, are no longer good law. They predate the McVeigh case. Regardless, even under the old law, misrepresentations to providers about what they would get were never preempted by the District Court. And so, again, the Blue Cross had no reasonable basis to remove under the federal officer removal statute. Now, this one is a little bit unique, because in its original memorandum in opposition to the motion to remand, Blue Cross relegated this issue to a single footnote. There was then reply memoranda, surreply memoranda, none of which further mentioned federal officer removal. The District Court did not even address it in its opinion, because again, it was simply relegated to a footnote. Ultimately, there was a motion for reconsideration. The District Court ruled that the issue was meritless, but waived in any event. And the real question here is, did the United States Supreme Court, in the Watson case, overrule Winters? And the answer is, absolutely not. In fact, in the case, the courts were applying federal officer removal for what the requirements were. It went on to say that it need not consider, in that case, a case that didn't deal with a private contractor at all, whether or when private contractors may invoke the federal officer removal statute. It put that issue to the side. Instead, Watson made a gross distinction between those who are regulated by the government, and those who provide goods and services to the government. And after making that distinction, it dealt no further with private contractors, except to say that Winters was the example, and it need not consider whether and when private contractors can even use the statute. It then went on to the other hand, the regulated side of the table. And it determined that being subject to regulations was not sufficient. No matter how detailed, no matter how burdensome, a company like Philip Morris, that has to comply with regulations, cannot claim the mantle of being a federal officer. Now, there are other cases out there, going back to Willingham, which are very distinguishable, because there, we have essentially full-time government workers, whether they're government employees, or private contractors. And in the Willingham case, for example, the warden and chief medical officer of Leavenworth, the prison in Kansas. But Willingham does announce a fairly broad standard, that the removal statute is broad, and the defense need only be colorable. I assume that test is one that we should apply. Well, Willingham, as you will recall, was about 30 years before Winters. And Winters articulated a different test for private contractors. Willingham, of course, was not a private contractor. We had employees of the federal government, the warden and the chief medical officer of Leavenworth. And so, Winters had obviously had Willingham at its disposal in 1999, and recognized that for private contractors, who do some work for the government, some work for private parties, that an additional test was needed to determine, are they in fact acting on behalf of the government when they're doing something, or on their own behalf? Well, is that part of the Willingham test still viable, that says the federal defense need only be colorable? I agree that it is, in terms of the colorable defenses. And frankly, I think that's Blue Cross's best argument, but they need a lot more than that. Under the Winters test, they need first to show that they're acting under, and that means this direct and detailed control. And that was clearly met in Winters. The question of the production of Agent Orange, that defoliant, that those of us of a certain age are familiar with, of course all used during the Vietnam War. And the specifications were nothing if not precise. And in fact, there were warning claims in Winters, and yet the record showed that the government restricted what could be on the packaging, including warnings. So direct and detailed control. And so that was another step that they would have to show, in addition to these colorable defenses, is a causal nexus. So not only are they subject to this control, but that the federal government's directions are connected to the plaintiff's claims. And so the question arises in this case, how has Blue Cross shown that the United States told it how to interact with providers like Omega Hospital, in terms of a pre-admission verification? There's no record evidence of that. And in fact, it's inconsistent with the allegations of the petition, which show that all of Omega Hospital's claims were treated the same way. There was no suggestion in this verification process that for federal government employees, that they would get a different treatment from Blue Cross when they were at the hospital and needed verification. The representations, the treatment to Omega Hospital were across the board. And so Blue Cross can't show any causal nexus between governmental instructions and directives on the one hand, and what it actually did in interacting, this commercial reality memorial talked about, with Omega Hospital. So ultimately the question is, was it reasonable for Blue Cross to rely upon out-of-circuit authority on the basis of Watson, when Watson specifically said, we need not consider whether and when this statute may be used by private contractors? I would think that it's unreasonable in that instance, because again, Watson was so explicit that that was not the issue there. And in fact, the courts of the Eastern District have been uniform. Judge Engelhardt, Judge Vance, Judge Fallon, in saying that Watson didn't change anything. Winters is still the law of the Fifth Circuit. Let me move on now. I want to hit this notion of discretion again. This court said in American Airlines v. Sabre that the District Court has discretion on this question. And Blue Cross in fact persists in removing providers' claims, and there was a denial of that. And the District Court had discretion in this case, and that's the only question before this court. The federal officer removal is not an issue. The case is back in state court as a trial date of May of 2015. On this record, and based on this law, the District Court did not abuse its discretion in finding that Omega was entitled to its modest expenses about $30,000, and this court should affirm. There's also a motion pending for the additional costs incurred on appeal, because if there is not any recovery on appeal, then obviously it's a sum of diminishing returns. To have to defend the judgment in the appellate court starting from $30,000 would not make Omega Hospital whole. I recognize this court has discretion on that matter, either to require the submission of fee applications here or remand the matter to the District Court. And with that, we would ask the court to affirm the District Court's ruling. Let me, before you sit down, your reply brief, your brief doesn't reply other than with one sentence I think to the discussion of Jack's. What do you say about the Jack's case here? Let's say a few things. The first point is that Jack's misinterprets Watson and would broaden this test. Instead of a causal nexus Let me just ask, is your position that Jack's is wrong and it is not a reasonable interpretation on which we should rely insofar as what was colorable? I do believe that it's wrong, again, because of what we've got a case here out of the Fifth Circuit, Winters, which specifically tells parties what they need to do. Jack's is also a subrogation action, and subrogation is a component of that federal plan. And so there's at least a colorable argument there when they're doing exactly what they were told to do in the plan, that is, seek subrogation when one of the particular insureds has been hurt, to go after the money if there has been a tort recovery and recoup it, and it goes to the United States Treasury. This case is factually distinct. Your Honor, you listed just a little while ago some judges who had dealt with this issue already in the Eastern District. Have any of those cases involved assessing attorney's fees for the removal? Your Honor, offhand, I am not recalling one that does. Thank you, counsel. Thank you, judges. All right, thank you, Mr. Flanagan. Mr. Feinberg, you've saved time for rebuttal. Yes, thank you, Your Honors. I just want to run through each of the three points that Omega just addressed. It is true, the de Villa test, the two-part de Villa test applies, as I mentioned before. On prong one, the test isn't anything other than could they have brought it. And here there are assignments, but you don't even need to look at the assignment in the record. Their allegations say we want money for providing covered services. Well, how are they possibly entitled to that unless they have an assignment? And the answer is they're not. And the Emerus case that we cited makes exactly that point, as does the Spring case on which the Emerus case relies. And again, we fully agree that misrepresentation claims are not preempted. In most of the cases, if not all of them, that Omega just cited were misrepresentation cases. But that's not all we have here. As I mentioned before, there are two other claims that have nothing to do with misrepresentation. They don't say anything about misrepresentation. These are causes of action one and five. And this notion that there's somehow a unique element in Judge Medekwip, I don't know what that means unique. An enrichment claim is unique in that it's different from the misrepresentation claim. I completely agree with that. That's exactly why it is preempted, whereas the misrepresentation claims are not. I want to mention just a word or two about FEBA, because I think the court probably doesn't need to deal with this issue, which is why I didn't address it. If there's complete preemption under ERISA, then the case was properly removed. You don't need to get to FEBA. And that's the end of it. If there's not, then the FEBA argument is going to fail for the very same reason, because it's essentially the same test. The other question, whether or not there can ever be complete preemption under FEBA, is a very complicated issue, and we strongly disagree. Those two cases that Omega just mentioned, AAOT, the anesthesiologist case, and Alabama Dentist, both post-date Empire, and other cases post-date Empire, too, that find complete preemption, including a 2007 decision in one of the Center for Restorative Breast Cancer cases. But that's a very complicated issue that I don't think this court needs to address, because this case will rise or fall on the other issues. And on federal officer removal, the key point is exactly what my opponent just said, that Watson did not overturn Winters. But Winters doesn't say there has to be direct and detailed control. It doesn't say that at all. That happened to be the facts in that case. And you need look no further than this court's decision in Bell v. Thornburg, because it's direct control over the defendant in that case. The defendant chose to fire the individual, and that was enough for there to be federal officer removal. And this isn't new with Watson. This goes back to the 1800s. One of the cases that Watson cites is a case called Davis v. South Carolina from the 1880s. And at the time, federal officer removal only applied to revenue agents, and there was a federal marshal who was acting as a revenue agent. But there was also an uncommissioned Army officer helping him, and he accidentally shot the person who they were trying to arrest. And the court said, that is acting under, that's sufficient acting under. And clearly, there was no direct control of the revenue agent telling the Army officer to shoot the person, accidentally or otherwise. You just don't need direct and detailed control under any test. Thank you, Mr. Feinberg. Your case is under submission. The court will take a brief reset.